The next case for argument is 16-2722, Sanofi v. Watson. Good morning. May it please the Court, I'd like to focus on three legal issues that the District Court, three legal errors that the District Court made in deciding this case against the defendants on the 167 patent and the 800 patent. What presidential authority has held that there's no infringement where an ANDA defendant's project is labeled for a use claimed in a patent? I'm sorry, Your Honor, what case? What presidential authority has held there's no infringement? There is no case directly on point with respect to the infringement issue that's presented here. Okay, that answers my question. The issue, if I may, I'll address the inducement issue first. The legal issue that the Court made a mistake on is the issue of intent and inferring intent based on a label that was ambiguous. So the general rule, there's no dispute that there were substantial non-infringing uses in this case for the product as labeled, and the only issue was whether or not the label itself induces infringement based on what it says. And the label itself doesn't contain an explicit instruction to administer the drug to the patients with the risk factor. You mean by instruction? I mean, the pharmaceutical company doesn't instruct the doctors to do something. It gives information. It supplies a product, and then it provides information that the doctor will use to decide which patients to use the drug on. And here, the indications for use says it's for reduced hospitalization, and then it says if you want to know for which patients we think that will occur, see section 14, most of which is a big Athena study that says, here are the patients for which this will be used. How is that not an intent that the product put out there will be used for that class of patients for which we spent a lot of money showing net benefit? So the indication section refers to the entire clinical study section, not just the Athena trial? That's why I said most, right? And there's a little section on Uridis, is that how you say it? Uridis and Adonis. Uridis and Adonis, which are companion studies. And then there's one for Andromeda, which says there might be a problem here. So... Correct. By referring to the clinical study section, it's not referring to an instruction only to administer to the patients with the risk factor. Why should it have to be only? Why shouldn't there be inducement for all of the indications that the label says this is a good product for A and for B? You can induce both. Because under the case law, for example, the Vitamix case, an instruction that results in ambiguity or could result in infringing uses or could not result in infringing uses is not enough to demonstrate specific intent to induce infringement. In this case... So just, I mean, does Vitamix really stand for what I think your proposition is? Or tell me if this is the wrong proposition. You put out a product and you say, you can use it for A or you could use it for B. A is the infringing use, B is not. You're not liable for A because you also said you can use it for... in another way? It's probably a little more subtle than that, Your Honor, in that the instruction itself doesn't say you can use it for A or you can use it for B. The instruction itself is ambiguous as to who it can be used for, which is what the case is here. The instruction in the indication section is ambiguous as to the patient population. The closest it comes is the patient population it describes in the indication is the patient So all it does is refer you to a clinical trial section that also contains information about uretis and adonis. So the instruction itself is ambiguous as to what it's telling you to do with the drug. It's not telling you to do anything. All it's doing is providing doctors the information about what this massive set of scientific studies have indicated is beneficial. That's correct. And under those circumstances... But inducement doesn't require... instruction is an ambiguous word. Often we use it to mean I tell you what to do and I've just instructed you. That's not what goes on in this world or in general. You don't need that for inducement, for encouragement. Right. I agree with that. I think you do, though, in a circumstance where the actual instruction or what is being described in the label is ambiguous. Here, there isn't a... So, for example... Ambiguous to what extent? Ambiguous as to what population to administer the drug to? Correct. Correct. It's ambiguous as to what population. The only limit in the indication on the population is the population that's described in the Uridus and Adonis studies, which is a patient with either persistent or paroxysmal AF. That's the only limit in the instruction on who gets the drug and what... But wait a minute. But the Athena study taught to patients over 70 and with certain risk factors. Correct. So, that's one of the... So, that section, 14, points to potentially maybe more than one population to which this drug should be administered. But that population in the Athena study is at least one of those, right? That's correct. Yes, Your Honor. Okay. So, if your... Is inducement never or not able to be available? If you have something that points and encourages this can be used for A or B and you're just in B, can't that still be inducement? It could be as long as there's enough evidence of intent for B. So, it could be... The Vitamix case says it's not enough. Just that is not enough. There has to be something that... Well, Vitamix facts were a little differently. I mean, what we were dealing with in the blender was a little different. But Vitamix did not preclude having two alternatives. If you encourage to do this or to do this, that doesn't preclude... I mean, there's substantial non-infringing uses and that precludes contributory infringement, but not induced infringement, right? That's right. Again, but it depends on how much evidence there is of intent. The problem with what the district court did here is... Well, are you suggesting that because other than Section 14, none of the other indications or instructions refer to a particular population, then we should ignore what's in Section 14 or pay much less attention to it or what? I think what you can gather from Section 14 is that there are multiple studies. It's a descriptor. It's a descriptor of studies that were performed. And under the Takeda case, a description by itself is not enough to show specific intent to induce infringement. So the reference to the clinical studies is not an instruction as much as it is a descriptor. It's a descriptor of multiple studies, including the Uridus and Adonis study, in addition to the Athena study,  You object to the district court's reliance on AstraZeneca and the Apotex and spend a couple of pages in the blue brief distinguishing it. And your position is that the case actually supports you, and you cite some language to show your interpretation regarding substantial non-infringing uses. I went back and looked, and what AstraZeneca actually says, regardless of the substantial non-infringing uses of a product, liability for active inducement may be found where evidence goes beyond the product's characteristics or the knowledge that it may be put to infringing uses and shows statements or actions directed to promoting infringement. And such statements or actions may include instructions in proposed drug labels. How do you distinguish that language in AstraZeneca? I think in AstraZeneca, the instruction there was to titrate down. There was a positive, affirmative instruction to titrate down to the lower dose, which would lead to infringement. It's a little different than here, where the instruction could either or. It could lead to infringement, it could not lead to infringement. So it's not enough to just have the instruction by itself. Especially the way the product was packaged, in the AstraZeneca case, you get a 0.25 milliliter vial, you use it, and if you're titrating down to the lower dose, you're going to only do it once a day. So that's where the extra kind of instruction is evidence of intent that's not present in this case. Can you turn? Our clock is running. So can you turn us now to the obviousness side? Yes, Your Honor. The legal error the district court made on obviousness was in applying the wrong standard for reasonable expectation of success. It's undisputed that the prior... If we disagree with you on the obviousness finding for the independent claims, do we need to reach your arguments about the dependent claims? On obviousness? No. The court generally treated all of the claims as a whole together, so there's no need to separate each of them. And that's claim eight in particular? Claim eight in particular. Claim one and claim eight are treated the same? It should be treated the same. And here's why. The court found that there was no difference as far as obviousness was concerned, and there was no... In a footnote, the court mentioned that it might have less of a reasonable expectation of success even in claim one, but the court didn't cite any factual finding in relation to that, but just mentioned it in a footnote. So I think that it's appropriate to treat all the claims the same. The issue with reasonable... Let me try to frame my question about that issue so we don't waste time on something. Stipulate for purposes of this question that the district court did not demand proof positive certainty. Something else, something lower than that. Now what's the error the district court committed? And if you can, articulate for me what you think reasonable expectation of success means. That's something less than certainty, something more than a decently grounded hope. What does it mean? So in this case, there are a couple of things that you can look at. The first issue is the disclosures. So there are two disclosures, the Hohenloser 2008 disclosure and the clinicaltrials.gov disclosure, both of which lay out every element of the claimed invention except for the Fed administering it while feeding. In that case, under the case law, the Pharmastem case in particular, the issue is whether or not a person... Let me put aside Pharmastem because Pharmastem relies very heavily on the admission in the specification about what the mouse studies already show. And I think the dispute there was whether or not the mouse studies actually disclosed that element. We don't even have that issue here. We don't have a dispute about what was disclosed in the art. It's indisputable everything was disclosed in the art. And in Pharmastem, the rule, I mean, the kind of law that was stated there was you can't... If the art guides you directly to the method, you can't say you claim you got an invention by just proving what the art told you it was going to do. So reasonable expectation is used as a measure to guard against hindsight and to guard against grabbing elements from multiple different sources when there's no guidance as to how to use those elements to get to the result. In this case, that's not the circumstance here. Here the method was taught in two prior art publications. The entire method was taught with the exception of one thing that is indisputably obvious. No one disputed it was obvious. This is almost an anticipation case, but for that giving it twice a day with meals element. So in that circumstance... And that if it were an anticipation case, we probably wouldn't be talking about reasonable expectation of success. That's correct. We probably wouldn't be talking about it. And I think the issue here then becomes with that statement, and again, along with the MPEP rule that it's presumed that if you have a protocol that's approved by the FDA that you're going to expect success with the statements in the art that said, all the contemporaneous statements in the art said we expect this to work, every single one. In that case... Well, every single one. Maybe I'm misremembering. I guess I was remembering two that were public. The private ones don't count because the private ones couldn't have informed what a person of skill in the art would have expected as opposed to what Dr. Homloser, is that how you say it? Homloser, yes. Homloser. The issue is not what he expected, but what a person of skill in the art would expect. And I guess I'm remembering two things. One, the extraordinary statement in the 2008 article. Yes. And then the second thing that he told subjects of the clinical study. Right. Why would, and that clearly presented for Sanofi a serious question. How do we explain this at trial? And lo and behold, they come up with an explanation, right? Their expert says a person of skill in the art would have understood that statement, at least in the 2008 article. I don't know about the other one, the statement to subjects, as a poorly formulated statement of the hypothesis being tested and no more. Why is, and Judge Andrews said, I'm persuaded by that. Why is that clearly erroneous? Because a hypothesis under the law would be enough in this case. A hypothesis would be enough under the law. The MPEP state, I mean, is a hypothesis. MPEP is not the law. Your Honor, I apologize. Under, okay, so I would add, not only the MPEP says that we will presume that it's reasonably expected to succeed if you have an FDA approved protocol. Because when you're giving the drug to patients, the FDA says, I want to make sure that I'm not going to. But even, I'm sorry, even taking that as a presumption, that doesn't mean that a finding to the contrary in a particular case is clear error. Correct, which is why I think the error, oh, I'm sorry. The legal error is the application of the wrong standard. And the factual error here is that it would have to, the factual error here is ignoring the contemporaneous evidence and relying on trial statements by an expert. Ignoring or weighing the other way? I think, based on the way the opinion reads, it reads like he ignored them by saying it's just a hypothesis. I'm not sure just a hypothesis answers the question of whether it's a reasonable expectation. Well, here's what I understood that the district court concluded, having heard all the evidence, which is, yes, this is quite a strong statement. But we've got the other experts saying this is nothing more than a hypothesis. This is how we write hypotheses. And the only thing in this article, it appears, led the author to these, whether you want to call them conclusions or hypotheses, are these two studies. And these two studies, and Judge Andrew spent a lot of time going through this post hoc stuff and saying, this analysis doesn't give me anything. It doesn't give me anything. And he used a word like inconsistencies or whatever. So he looked at what appears to be the underlying basis for the hypothesis reached in this, and he dismissed both of those ads. He actually didn't completely dismiss. He said a person of skill in the art would credit post hoc analysis, but would conclude, ultimately, that this statement was a hypothesis. No, no, no. Well, I disagree. I think he really spent a lot of time diminishing or demeaning the post hoc analysis. And even though it's a legal matter, he does say once, I think, well, it's got to give in some way. At the end of the day, I couldn't see. Now, you may think that's legal error, but I couldn't see that at the end of the day he really gave it any weight. But I'm not sure I think there is anything really wrong with that. If he was relying on the conclusions of expert, well, maybe there's something wrong with that, but I don't see the clear error. So I think the error is because none of the contemporaneous evidence at the time supports it. There's no, none of the statements at the time support that conclusion. Well, how are we supposed to know? I mean, one of the big fights here is, between the experts, is whether this is just a general hypothesis. I mean, this is the way science, when you're in high school science, you write a hypothesis, and it brings you to one direction. But it's really nothing more than a hypothesis. And one expert says, no, no, no, no, this is the real deal. How are we supposed to evaluate that? You're supposed to evaluate it on a basis of reasonableness. And I think that's where the clear error problem comes in here, because the analysis was not based on reasonableness. I mean, so... Whose analysis? The judges. The district court's analysis was not based on reasonableness, because by determining... I'm sorry, I'm sorry to interrupt, but when you say reasonableness, are you talking about reasonable expectation of success, the reasonableness in that definition? Correct, correct. Because when he discarded... When he evaluated the post-hack analysis and determined that it wouldn't... What he did was he determined that that wouldn't get you to a reasonable expectation of success. I don't think he... He didn't determine that the post-hack analysis was wrong. It just didn't get you where you needed to go. That's how I read his opinion. It wasn't that I would think that this is completely wrong. It's I would credit it, but I would be skeptical of it. And in this case, there is no basis for being skeptical of the post-hack analysis based on what was disclosed in the art and what the Holmhoser article actually said about what they expected. And putting... I understand that some of the statements by Sanofi were not public, but they are evidence of what someone would expect at the time. So it's... But the someone may be something different. This whole project seems to have been half a life's work of Dr. Holmhoser. What he would expect about this particular drug must be substantially better informed than what a person of skill in the art. And you have several people, I think, don't you? What's the guy's name? And a few others saying, even in light of Eurydice Adonis, this is kind of confusing. And both the European and the US, the FDA and whatever the European one is called, said, we're actually on the basis of Eurydice and Adonis. We are not going to approve this. We are that uncertain, whatever that uncertain means about whether this is net beneficial. I think actually what happened was the FDA, what the FDA did was we took a look at Eurydice and Adonis. And then we took a look at Andromeda and said, we think you need to do one more study. That's what the FDA concluded. We think you need to do one more study, which is how we end up with this. Yeah, they said, we think you need to, because it's so problematic. Because they were concerned about the Andromeda study. Because they were concerned about the Andromeda study. Well, there's a lot here. And I've just found parts of it on appendix 41 through 43 of the district court's decision. When he talks about the previous studies, he seems to buy Dr. Reifel's analysis of those studies, which he calls it discordant results. And he goes on to, I almost read this as almost he was kind of arguing this, almost teaching away his analysis, his evaluation of those studies. And he bought everything the other side's experts said about those studies, completely diminished. Well, he didn't discuss, the district court did not discuss what the conclusion was of the Andromeda study and what Dr. Reifel actually said about that study. No, I'm talking about the Eurydice study. Eurydice, right. I think what the FDA's conclusion about Eurydice and Adonis was, was that it was not sufficient by itself, given the Andromeda study, to grant approval, and we need to do one more study. So that's how Athena ended up getting designed. So is that the question here, whether that is sufficient to establish a reasonable expectation of success? I think, no, I think that's an explanation for what the judge, what the district court did here, as far as how it analyzed the studies. But with respect to what the court is, the standard is for reasonable expectation of success, the issue is whether or not, if you're viewing this as a person of skill in the art, in 2008 or 2009, would you expect, when you're given the Hohenloser argument, would you expect this is going to work? And yes, there were some questions. I've been trying to think about whether there is a, at least to my mind, more informative translation of reasonable expectation. Is it really whether the person of skill in the art would expect, or whether the person would expect by some probability in the neighborhood of 50%, maybe a little bit more, and have a scientifically reasonable basis for the expectation? Because lots of people, and I assume scientists are among them, have expectations that as soon as, that they would immediately follow the explanation. But this is just kind of a scientific intuition based on past things, and, no, could I tell you what the scientifically reliable basis for that expectation is? I don't think there is a standard for scientific expectation. I think there is a reasonable scientific expectation here based on what happened in the Uridus and Adonis studies, and what was reported in the New England Journal of Medicine about the post hoc analysis, and what was reported in Hohenloser. And the fact that the FDA approved this protocol to be used in patients. By the time Hohenloser was actually published, it already had been, the study had been going on for a while. So under those circumstances, if your question is, does the standard require scientific evidence or some sort of scientific underlying? A scientifically reasonable basis for an expectation. I don't think that's the standard. I have not seen a case where that's the standard has been set. I don't think PharmaSTEM necessarily sets that standard either. But in this case, that standard would be met based on what was presented at the time in 2008 in the Hohenloser article, and what was known about the Uridus and Adonis studies, and what the results were. Can I ask you, the statement in the Athena studies information to potential subjects. Yes. Also has this, it is expected. Correct. Language, that's the one other place that at least I'm remembering has it. Is that a common thing to put in statements to subjects in clinical studies? I have not seen a clinical study that said that before. I have not seen a clinical study protocol or patient information. I'm not saying it doesn't happen, but I've never seen it. I've done these cases a long time. I've never seen that before. And again, this is one of those circumstances where they're telling the FDA we expect this to work. They're telling patients we expect this to work. And now they're standing here saying no one expected this to work when they publicly announced that they expected it to work. So it's a little bit questionable. And I'm way over time. Yes. We've lost control. Thank you. We'll restore your rebuttal time and we'll add another ten minutes to the other side, but hopefully you will not need it. I may not need it, Your Honor. Good morning, and may it please the Court. Your Honor, I'd like to begin with the Court's decision on infringement and, in particular, his findings on intent. The Court did find that there was an intent to infringe here, and he did it on several factual bases. When you're going, I'm happy to hear what you have to say, but if you could just include in that analysis, I mean, we don't have that many cases. But it seems to me that whether we agree or disagree with you, this goes beyond where our cases have gone in terms of the inducement stuff. So could you just address the cases as I go? I will address the cases as I go. But in terms of the factual findings, the Court found that this product, according to the current label, is prescribed 80 percent of the time in an infringing manner. It found that these are undisputed facts. It found that when the defendant's product is sold with their labels, it will be infringed 80 percent of the time. Can I ask you about that? Yes. Because I have some question of that. I thought the number was 77, not 80 percent of the time. But the question I had about that number was there's something in the record that says that the label initially was more specific and included the Athena study, and then that was taken off. So I guess my question was, did those prescriptions that comprise the 77 to 80 percent, could it be that those prescriptions were given at the time where the instructions and the indication clearly pointed you towards the Athena study? No, Your Honor. They have not changed. And Dr. Zussman, the defendant's witness, said that it did not change the prescribing patterns of the drug. Okay. And the last fact that the judge found with respect to intent was that the defendants were aware of the patent and that they continued to pursue approval of this particular label without any amendments to avoid infringement. Now, turning to the court's legal standards on inducement, I think there are – Can I just – Yes, please, go ahead. I hope this is rhetorically short. Yeah. Could they have pursued – have sought a different label? I don't know, but we've seen it in other cases where that is exactly what the defendants did. And sometimes it took them out of inducement and sometimes not. And then they might make you – I mean, can their label be different from your label? No, I think what they would have to do is convince the FDA that they were entitled to a different label, and it would not affect us typically. Okay. I haven't heard of that particular instance. So with respect to the case law on inducement, I think there's a spectrum. There are those cases where there is no question that the product is going to be used in an infringing manner. In those cases, you are entitled to presume intent. I think the MGM case from the Supreme Court says that quite clearly. And you very rarely see those cases because that's not something that's often litigated. On the other end of the spectrum is where the label does not say anything about the infringing use. That's the Warner-Lambert case. I contend that's the Vitamix case. And then there are cases in between where the label says something about an infringing use and at the same time has a substantial non-infringing use. For example, the AstraZeneca case where the primary use of the product was non-infringing. It was twice-a-day daily dosing. That's what the defendants were trying to say. That point to do in more than one direction. That's why I think this case would go beyond AstraZeneca because there was a clear label instruction and here there's not. Here it's all about encouragement, I guess. Yes, that's right, Your Honor. Rather than instruction because it's not in the light. So am I right about that? I think, Your Honor, what the court found, if I could just talk about our label for a moment and how the court analyzed it. The court said basically that if a physician was presented with a patient, let's say a 75-year-old patient that had diabetes and a diuretic and wanted to keep that patient out of the hospital, the physician would know a few things. First of all, based on the prior art, no other anti-arrhythmic drug ever treated that condition to keep the patient out of the hospital. It was never shown to do that. In fact, all of them were shown not to have that effect. Also, it killed people. Yes, that's right, it killed people. And then so he would consider the dronetarone label and he would see right in the indication that it is meant for the prevention of cardiovascular hospitalization, reduces the risk of cardiovascular hospitalization, right in the indications. And it says then in the indication, see clinical studies 14. The doctor would then go to the clinical studies and the first thing he would see most prominently is the athena study. The athena study, as the judge found, is the only study that reasonably relates to the prevention of cardiovascular hospitalization. He would see that a patient needing... That was designed to relate to it. Your Honor, actually... But isn't the whole point of the post hoc analysis is that when you look back at Iridis-Adonis, it does turn out to relate to reduced hospitalization. The design of the study had nothing to do with it. It wasn't an end point. And that's why everybody would know that this was a post hoc analysis, whether or not it said it in Hohenloser or not, because it had nothing to do with the end points. And so what the post hoc analysis was used for in Dr. Hohenloser's paper was to design athena to figure out how many patients do we have to enroll. It's a guess. You never know how many patients you have to enroll unless you make some estimate as to what the effect size is going to be. And remember, again, the primary thing that they were looking for in the athena study was no difference on mortality, neutrality on mortality. It was a total surprise that it reduced cardiovascular hospitalizations. That finding was commented on in the art as a breakthrough and as remarkable, a total surprise that that happened. And that's what they were able to seek FDA approval on that particular indication. But the post hoc analysis was used solely to construct the patient population size of the athena study. That's why it was done. And we've kind of morphed. Sorry. Right. I'm sorry. But back to the physician with the label. So the physician would read the athena study information. Can I ask you about that? Please, go ahead. But one thing that just confused me, in the athena study, in 14.1, the second paragraph talks about giving it that the patient population is those over 70. And then three paragraphs later it talks about patients ranging from 23 to 97. Yes. So how are we getting to 23 when I thought the patient population was 70 and over? The patient population in athena, I believe, was 70 and then raised to 75. That's right. Are you talking about uretis and adonis? No, I'm talking about the page 76.24. I'm sorry. I now know the answer. It's over 70 or has a risk factor. Or has a risk factor? Yes. Well, that's not what paragraph two says in the athena study. They say at or over 70 with at least one risk factor. The athena study was modified at some point in the original protocol halfway through because they were not seeing, frankly, enough deaths in the enrollees in order to have a successful. And the pre-modification version included 24-year-olds with risk factors. Yes, I believe that's right. But not the post-modification. Yes, I believe that's right. Post-modification, it was only young people. It was older patients, I believe. You had to be older. Yes. Okay. I'm sorry to distract you. Okay, so you were saying. So the physician has the label. The physician consults the athena study. And he sees that a patient just like the one he is presented with is helped. That exact type of patient is the one in which dronetarone was shown to reduce the risk of cardiovascular hospitalization. And what the judge found was that based on that evidence, that the physician would be encouraged to give that drug to a patient according to the label. And as this court has found, it is not an instruction that's necessary. It's encourage, recommend, or promote. And promotion or recommendation is similar to what the Supreme Court has said about inducement in the MGM case. That's the language that they used. Do you want to turn to obviousness? Yes. Your Honor, the court considered the Holmloser statement and the. . . Two statements. I mean, how is it that in the information given to subjects that that could reasonably be viewed. . . And this is not a scientific readership. This is not the New England Journal of Medicine. That that could be understood as anything but jump into the study. You should think it's going to work. Okay, so there's a couple things to say about that document. First of all, there was no evidence that it was ever promulgated to anybody. Well, the subjects. No, no. In fact, that document that was referred to and entered into the record might have been a draft. It was contained within Sanofi's files and at most was given to physicians at their hospitals that were going to run the study. Now, what physicians did at their hospitals, and there's clear evidence of this in the record because this is what Dr. Zussman did. They have a negotiation with their institutional review board, which governs the administration of that in their hospital. And in his instance, he rewrote that section. He rewrote it to take all of the expectation language out of it. And that you can find at the record at appendix 236 of page 338, starting at about line 5 through 340 line 14. So at his institution, he rewrote it. So the evidence of what was actually given to patients is not the document that was talked about at the court. Did Judge Andrews make any specific finding on this specific point? I don't think he said. I think he said it wasn't prior art. I think he concluded that in a non-prior art section. He cites it somewhere. My recollection is there's a citation to it. It's, I think, at page appendix 39. I mean, he seems to accept. He says Dr. Zussman also points out that the written subject information provided to the Athena trial patients started the expectation. So he seems to assume that this was or find that this was given to patients. I'm sure you're going to tell me I'm wrong. Well, Your Honor, that was not. I don't know that this is a factual finding. I think he's pointing out that that's what Dr. Zussman said. I'm not sure that rises to the level of a finding that he made to the court. I think what he's saying is it didn't matter in his analysis. Just like the homeloser statement that's in the prior art publication and like the post hoc analyses, that they didn't overcome the overwhelming evidence of uncertainty that he found both based on the prior administration. That can be read two ways. That is, the initial one did, but not what was given. Well, I guess we can look at the testimony that he said it, but I mean, I assume on cross-examination. I mean, well, we can look at that. That's right. That was on cross-examination that you'll find that, Your Honor. So back to the consideration of that evidence, when he looked at the homeloser statement in the article, he said, the judge said, you have to look at that in the context of two or three different sets of prior art evidence. The first one was the prior art failure with other antiarrhythmic drugs. So a lot of antiarrhythmic drugs were tested. They had better antiarrhythmic properties than dronetarone has, and they were found in each and every case to either worsen or to not better cardiovascular hospitalizations. They didn't show a reduction in cardiovascular hospitalizations, and sometimes they worsened them. And what the defendants say is, well, all of those are irrelevant because they're different drugs. But that's not the case. Imagine if the opposite were true. Imagine if every other antiarrhythmic drug were tested and in every single instance it reduced the risk of hospitalization. I think that would be the primary argument in terms of obviousness of this patent. The fact that every single other antiarrhythmic drug that had better antiarrhythmic properties than dronetarone failed to reduce cardiovascular hospitalization I think is very important and would set the mindset of a POSA, a cardiologist that knew about that evidence, in viewing things like the homeloser paper. Can I bring you back to the subject? Yes. So I'm looking at page 210 of the appendix, page 236 of the transcript. No, I'm sorry, it's appendix 236. Are you looking at my site or something different? Appendix 210. Oh, I'm looking at the judge's site, Judge Andrew's site. 210 at the bottom, page 230. He cites pages 236 to 237, and this is Dr. Sussman testifying. It seems to me he says pretty plainly, at least twice, was this given to patients? Yes? That's it, 236, line 13. 237, line 18. And that's the information that was being provided to patients? Right. And is there a cross-examination here? Yes, this is cross-examination. So he's being shown the Massachusetts General Hospital version of that form on those pages. Is DTX 24, is that the? Oh, DTX 24, I'm sorry. Again, Your Honor, could you go back to the page number? I'll follow you. I apologize. So he's being shown DTX 24. This is on transcript page 236? No, transcript page 230. Okay. I'm with you. What is DTX 24? It is the written subject information. Right, okay. So that's at page 7977 of the appendix. So that's the one with the it is expected phrase. That's right. He says that those two pages, 236 and 237 of the transcript. Yes, I'm with you. Which is what Judge Andrews cites at page appendix 39. That this was, in fact, being given to patients. So patients are being told, expect success. No? Your Honor, I disagree with the question. Does this reflect information that was to be provided to your patients? Yes, this would be the information they expected us to share with your patients. And then he says proposed later on. When is that? Oh, next slide. 237. Right, this is the proposed language. Right. And he rewrote it at his institution. And so did he say, you had said when we started on this subject. Yes. That somewhere he testifies that, in fact, he doesn't know whether it was, whether he rewrote it and that he doesn't. Yes, I'll take you right there if I could, Your Honor. Is this appendix 236? Yes, at page 338. At line 16, he's shown a question. This is what the patients got. Yes. So now we're talking about what the patients actually received. Only evidence in the trial as to what the patients received. Okay. And this is the Massachusetts General Forum. He said yes. Every individual reviewed it, yes. And since the table of contents of the joint appendix unhappily does not list the exhibit numbers, is that exhibit number, this is joint exhibit 218 in our appendix? I don't know if it is, but the relevant language is in the transcript. Are you about to tell me where? Yes, it's right on the bridging from 339 to 340. Based on currently available information. Oh, so that's actually a NOAA statement. That's right. And that's what they took. Whatever information was given to them from Sanofi, rather this or something else, and Dr. Rafel testified to the same effect. And was there any testimony besides the Zusman testimony that we've been talking about, other witnesses about how DTX-24, the proposed patient information, was or was not given to patients? Or is this the record on this? I believe Dr. Rafel also testified that his institution changed it. And I believe one of the witnesses that – I sort of would expect it to come from the other side. No, not that I'm aware of. The only testimony I'm aware of where a witness at Sanofi was shown this document that said, I'm not sure if it's a draft. Okay. Since you raised Dr. Rafel, one of the concerns I have in the case is his testimony. I mean, the district court clearly credited a lot of what he said. Yes. And one of the major issues here is just how we read the 2008 document or what a hypothesis is and what, you know, what it means in the scientific community in this context in particular. And so one of the difficulties I had, and I guess it's Appendix 369, Dr. Rafel, and this kind of goes to what he was talking about when he was talking about hypothesis, when he was evaluating what a reasonable expectation of success is, what that all meant to him. And he says something like, it may be worth testing prospectively the hypothesis derived from it. I would make no other statements about it. I would not use it to alter my clinical care. Question, I understand that. Let me just make sure I understand what standard you're applying. You're saying a person skilled in the art cannot expect success until they have placebo-controlled phase three clinical trials, establishing that the drug works in that way. Isn't that right? Yes. That's your position? Yes. That's what a reasonable expectation means to you? Yes. That's not the law, right? No, I agree with you, Your Honor, that the law may require less in other instances. For example, in this case, had Sanofi run a phase two. Well, in this instance, he's talking about this case, though, and isn't it a little troubling, or wouldn't it lead you to question his evaluation? And this is the context of whether or not this was a hypothesis that was meaningful, and if he thinks the only meaningful measure for reasonable expectation of success is three clinical trials, that leads you to question his view. But doesn't hypothesis mean something different? Well, a hypothesis means something that needs to be tested. The way I understand it means it's something that needs to be disproved, if it can be. Well, that's right. Ordinarily, hypotheses are written in a positive way, and the point of the trial is to try to see if it's been disproven. So you never necessarily prove something. You disprove things. So that's why a hypothesis is always written as an affirmative, declarative sentence, like it was in the Dr. Holmes case. But what is this statement, in this context, in which he says, what reasonable expectation of success means to me, in this context, is a successful phase three clinical trial, which is probably too high a standard. Well, okay, so in this instance, he was faced with all of the uncertainty that we've discussed. He was faced with his own personal view that when you look at the – well, his scientific view – that when you look at those prior studies, you saw patients being killed. When you looked at the Andromeda study, which overlaps substantially with the population that eventually was within Athena, about 50 people were being killed. But once you start focusing on his personal view, then I – No. I mean, what he thought. What he thought. I don't mean his quirky personal view. I mean his view. Was he involved in writing the written – the proposed written statement to the subjects of the study? Everybody else may have said, well, we can't say that. We've got to change it. This is what Sanofi proposed. He was always testifying from the point of view of what a poster would think. So if I'm using he thinks, I meant by he thinks what a poster would think. I don't know that he was involved in – he certainly wasn't involved in writing any of the Sanofi documents. Not Dr. Raphael. He had no involvement with it at all either. I see. I got the wrong piece. Yeah. It's Dr. Raphael. I didn't know what he meant. Okay. You've been talking about Dr. Raphael? I have been, yes. Yes. Okay. Sorry about that. Okay. So back to Dr. Raphael's statement. What I think he was saying is in light of all the uncertainty, that at best what Dr. Honloser was saying was a hypothesis. And in his view, to test that particular hypothesis, you needed a phase three clinical study because of the risk of mortality that you saw in Andromeda and the modest effects on antiarrhythmia that you saw in Athena. Given those very modest effects and given the mortality you saw in the other drug and the fact that no other AAD had ever been shown to do this, that's the type of study that he thought you would need. Could there be another study? Is the law that you need FDA approval or a phase three clinical study? No. It is not the law. One could conceive of a large phase two study that would answer this particular question. That didn't happen in the prior art here. And, in fact, many companies run a phase two study before they do a phase three to reduce the risk of a phase three study. That did not happen here. So the only evidence that this drug ever actually reduced cardiovascular hospitalization came from the phase three study. And he thought to answer that question, in light of all of the prior art, that's what you needed. Did Dr. Reifel testify or did anybody else testify about whether language like the it is expected can be found in other scientific publications as clearly meaning nothing more than we hypothesize and we obviously have a hope that we wouldn't be doing it, but we're not stating an actual expectation of that result. Yes, if I could take you in the appendix to page 231. And this is the protocol that we're talking about here. This is the protocol for the Andromeda study. So, remember, this is the one that failed in the prior art and had to be stopped early because of greater mortality. So appendix 231 on page 320, the question says... Who is this? This would be Dr. Zussman, I believe. I'm sorry. Zussman. So this is their primary witness. Page 320. Yeah, 231 of the appendix. Page 320 of the transcript, starting around like 18. And they state that given those properties, this is the authors of the Andromeda protocol, we anticipated that dronetarone would reduce the rate of hospitalization. And that was disappointed. Yes. Actually, Your Honor, that's not the protocol. That's the final study result. But that is the hypothesis of the study. We anticipated that it would do this. Wait, what about the Andromeda study? It's the final report of the Andromeda study. It's not the protocol. But that's the way the hypothesis was stated for Andromeda. So that's a similar type language. We anticipated that. I realize this is a transcript. Yes, I understand. No, is that language that was in the Andromeda document? Your Honor, I don't have it in front of me. But I believe that's the way that I would read that. Exhibit 219? Yes. Again, I don't know if that's an argument. I don't think it is. Okay. Okay, but that, I mean, you were asking me, is there anything else in the prior that's similar to that? Yes, that's another way of stating a hypothesis. It's always a declarative sentence. And, Your Honor, one other note, if I just may. I see I'm out of time, actually. Aren't you glad you got that answer? I'm sorry. Thank you very much, Your Honor. You can make another point because, you know, we may. The other point was, is if you look at the Hohenloser, there are contemporaneous statements by Dr. Hohenloser at the same time as this 2008 article where he says, the potential to reduce career adversity. And then somebody else says, emphasize potential. He says that. Emphasize potential. That's a quote from him to a journalist. Right, but then somebody else reading it, another skilled artisan, I forget the other guy's name, says, note that Hohenloser uses the word potential. Yeah, I believe that's right. I thought it was his quote to a journalist, both of them. Potential, and I must emphasize potential. And that's another thing that a person of ordinary skill in the art world. Thank you very much. Thank you. Your Honor, very briefly, with respect to the issue of reasonable expectation of success and what was examined here by the district court and how the district court went about analyzing the issue, the district court didn't look at reasonable expectation at the time in 2008. It's apparent from the analysis that what the court did was take it backwards, take it from not expecting success and then backward, back, I'm sorry, the word I'm looking for is escaping me, but looking at it from a backwards angle. Instead of saying what is a reasonable expectation of success, he looked at whether or not the art at the time taught that you would expect it concretely to work. And that's why the court discounted the statement in Hohenloser as a hypothesis. Do you have any more information about whether or not this written instruction was given or not given? You heard the dialogue about what's in the appendix. I don't have any more information about whether it was given. My understanding is that's what Santa Fe presented to the FDA as what they wanted to present to the participants in the clinical trial and that we don't know whether or not all of them changed that, but that was the proposed written study information. And along with that was a statement to the FDA, we expect this to work. So it's not just patients that they wanted to tell that they would expect it to work, but it was also the FDA in order to get approval for a protocol that they published as prior art. So on the reasonable expectation analysis, instead of looking at what would a person skill, would a person reasonably expect it based on kind of what the law is, which is when you publish something with almost all of the elements, you have more of an expectation than when you're trying to pull elements from multiple different sources. And when the court analyzed the reasonable expectation, instead of looking at it from a reason perspective, he started knocking down all of the evidence that was in the art at the time in 2008 that suggested a reasonable expectation. So he analyzed it from the back end forward in a hindsight sort of manner rather than what would a person... Just to address that, if the question is whether a person of skill in the art, a relevant person, would have had a reasonable expectation of success, doesn't that person, in fact, look at the body of evidence existing at that time, and that includes suddenly the new 2008 publication of basically the protocol in the New England Journal of Medicine with Dr. Hohenloser's characterization, but it also includes the other stuff, some of which points in the other direction. And as long as the totality of it... So you do have to have some kind of retrospective look. And Judge Andrews says somebody looking at all of that would conclude what, I forget, one of the publications said that this was sort of confusing and uncertain. Certainly the word confusing was in there. Confusing and severely challenged so far, namely the clinical data. So I don't think the clinical data was actually confusing. The clinical data... And this is where I think the district court erred in the stringency of the expectation requirement. When you look at the body of evidence at the time, the body of evidence did not teach away from... It didn't teach away from using dronetarone in the protocol that was published. It didn't say, don't do this, right? It didn't teach away from the very protocol that was published and Hohenloser said you would expect to work. It might have caused someone to not have a concrete expectation of success. But that is not the standard. That is not the legal standard for reasonable expectation of success. The word concrete is a slightly... I guess that seems to me an unfamiliar one in this area. Concrete doesn't seem to tell you something about probabilities but something about the specificity of the basis. And that doesn't seem to me that when Judge Andrews used the word concrete, I don't read that as meaning extremely high probability, only something other than basically a specific evidence foundation for the expectation. I read it as requiring more than a reasonable expectation of success. He said the 2008 Hohenloser article represents a hypothesis that requires future testing rather than a concrete expectation of success. So as I interpret that phrase, that is requiring something more than just reasonable... You have to do testing in order to prove it, which to me suggests an actual success. You have to demonstrate an actual success. And there are other parts of the opinion where he does that as well. He uses the term concrete multiple times in discussing... When he uses it, at least the primary way, he juxtaposes it against a hypothesis. So I think that supports Judge Toronto's view that we're not talking about concrete versus reasonable. We're talking about a concrete expectation of success as opposed to a hypothesis. He juxtaposed those two terms. He did it sometimes, and sometimes he did not. But I will point you to... The court did also discredit Dr. Zussman's testimony by misstating what Dr. Zussman said. He says that Zussman testified that a person of skill in the art would look at the Hohenloser 2008 article and conclude that it was obvious that the trials would successfully hit their primary endpoint. That is not the standard. That's not the standard Dr. Zussman applied, and that's not the standard in this court for reasonable expectation of success, showing that the trials will successfully hit their primary endpoint. And with that, I will... Thank you. Thank you. Thank you.